# TSUNEKICHI MATSUNO *vs.* THE AMERICAN SCHOONER CONCORD.

## June 28, 1907.

*Negligence causing injury to a trespasser:*    Negligence whereby injury is done, is not excused because the person injured is a trespasser. *Richmond v. Bronson,* 5 Denio, 55, dissented from.

*Construction of fishery clause in the organic act:*    The Hawaiian organic act declared certain sea fisheries, which had previously been free to citizens and residents alike, to be free to citizens of the U. S. *Held,* that without further enactment or authoritative notice to the contrary, such fisheries remained free to non-citizen residents as well as to citizens.

*"Fairway":*    "Fairway" and "midchannel" are used synonymously in 30 Stat. L. 101, and this use is in harmony with Century Dictionary.

*Failure of anchored boat to show statutory light:*    Failure of anchored boat to show statutory light does not impair her right to recover for a collision if such failure did not contribute thereto.

*Obstruction to navigation—Anchored boat:*    A boat anchored in an open roadstead near the entrance to a harbor where few vessels pass in the night, and fishing with lines, is not an obstruction to navigation.

*Collision with an anchored boat:*    A fisherman in an anchored boat which is run down through the negligence of a moving vessel, is not precluded from obtaining damages, because of his failure to move his boat out of the way of the approaching vessel, if he has not otherwise contributed to the collision.

*Moving vessel colliding with anchored vessel—Presumption of negligence—Burden of proof:*    A moving vessel running down an anchored boat is presumed to have been negligent and the burden of proof is upon her to acquit herself of liability.

*In Admiralty:*    Libel to recover damages for collision.

J. J. *Dunne,* Proctor for Libelant.

A. G. M. *Robertson,* Proctor for Libellee.

DOLE, J.    The libel in this csae complains that on the 27th day of August, A. D. 1905, at about two o'clock in the morning, while the libelant was engaged in fishing in his own boat, anchored off the harbor of Honolulu, he was run into by the libellee, whereby libelant's boat was overturned and injured,

all of his loose property in the boat lost and he himself thrown into the water where he remained some time until he was rescued, by which he was made ill so that he was unable to attend to his business for about a month, which collision occurred through the negligence of the libellee; and claims for the loss and injury to his property and his own loss of time and medical expenses, the sum of $368.30.

James Lyle and K. S. Sorenson intervened as owners of the schooner Concord and answered the libel admitting the collision and disclaiming all negligence, and claiming that the collision occurred through the negligence of the libelant in being without a riding light at the time of the accident; that he made no effort to avoid the collision which he saw was imminent; that he was anchored in the course of vessels approaching the port of Honolulu from the windward and that he was trespassing upon American waters in being at the place and engaged in fishing; and therefore from all of these grounds is not entitled to damages.

The claimants, in their answer, article 9, aver that " the libelant is not a citizen of the United States and had no legal right to engage or be engaged in fishing at the time and place referred to." Their counsel, in his brief, referring to this defense, says, "Our position, as already stated, is that the libelant being engaged unlawfully in fishing, was in no better position than an ordinary trespasser. From which situation two things follow. First, that the libellee could be held liable only on proof of actual malice, or wantonness, and second, that it is incumbent upon the libelant, before he can recover, to prove that he used more than ordinary care and caution to avoid injury." In his brief he adopts the reasoning and conclusions of the New York courts and quotes the following as laying down the principle upon which he relies: " Negligence is a violation of the obligation which enjoins care and caution in what we do. But this duty is relative, and where it has no existence between particular parties there can be no such thing as negligence in the legal sense of the term. A man is under no obligation to be cau-

tious and circumspect towards a wrongdoer" (*Richmond v. Bronson,* 5 Denio, 55), and he says that the case of *Needham v. Railroad,* 37 Cal. 409, quotes this citation approvingly. Upon inspection of this case, I find on pages 417, 418, 419, 420 and 421, a careful discussion of the New York case which was sustained by the court of appeals, and, as the court in the *Needham* case says, " seems to have become the settled law of that state." In the discussion of this case and of the law, as laid down by the New York courts, the court in *Needham v. Railroad,* supra, most vigorously dissents from such a view of the law and denounces it as " the false reasoning of the New York courts," and refers to a Connecticut case, *Isobel v. Railroad Co.,* 27 Conn. 404, as exposing the fallacy of the New York decisions. In this connection the following quotation from *Hamilton v. Goding,* 55 Me. 419, 428, is pertinent: " No man can set up a public or private wrong committed by another as an excuse for a wilful or unnecessary or even negligent injury to him or his property."

Considering this line of defense on its merits, it is not even clear that the libelant was trespassing in fishing at the locality stated. The organic act (act of April 30, 1900: 31 Stat. L., p. 141) provides that the sea fisheries of the Territory are free to citizens of the United States. Sec. 95. Certain of these, including the locality of the fishing operations referred to, the court may judicially notice, were free previously to the enactment of the organic act to citizens of the Hawaiian Islands and subjects as well, and during the brief period between the initiation of annexation and its completion by the enactment of the organic act, such freedom was enjoyed by residents of the United States as well as by citizens. Thus, after the enactment making such fisheries free to citizens of the United States, it can hardly be contended that the old fishing privilege by residents who were not citizens was thereby cut off without some further enactment which would forbid such freedom to residents not citizens or an authoritative notice to that effect. The fishing by residents, not citizens, has been continued from

the time of the enactment of the organic act until the present time,—a period of seven years, without protest,— has been conducted with enterprise and industry, and has contributed largely to the food products of the Territory and to the comfort of its population. In any case, no man may justify negligence whereby injury is done another by charging the other to be a trespasser, although it may be that in some circumstances such trespass would have a relation to the amount of damages which the injured party might be entitled to.

I find that this defense is untenable.

*Philadelphia, etc., R. R. Co. v. Philadelphia, etc., Towboat Co.,* 64 U. S. 209; *Pueblo v. Smith,* 3 Colo. App. 386, 391; *Spofford v. Harlow,* 85 Mass. 176; *B. & O. R. Co. v. Hellenthal,* 88 Fed. Rep. 120, 121.

Counsel for the libellee strongly urges that the boat of the libelant, being anchored and engaged in fishing seaward from the bell buoy, was in the fairway leading to the channel of the port of Honolulu and therefore that a fairway being a course of navigation, if the libelant did carry a light such as he claimed he did but not the kind of light required by law, and if he used more than ordinary care and caution to avert the injury, both vessels being in fault, he was in the wrong and the libellee was only liable for half of the damages; but if the libelant, obstructing the fairway, had no light the libel should be dismissed because the boat not being seen until the schooner was close upon her, the schooner was at most guilty only of an error of judgment *in extremis;* and if the libelant, obstructing the fairway, did not use the requisite degree of care to avert the collision then whether he maintained an insufficient light or no light, the libel should be dismissed because libelant's own negligence was the last proximate cause of the injury.

There seems to be no consensus of legal information as to the exact meaning of the word "fairway." In *The Oliver,* 22 Fed. Rep. 848, it is said that "a fairway is water on which vessels of commerce habitually move." This definition is too vague, standing alone, to be of any practical value. The Cen-

tury Dictionary says that "a fairway is the part of a road, river, harbor, etc., where the navigable channel for vessels lies," which agrees with the use of the word in the federal laws. Article 25 of an act to prevent collisions, of June 7, 1897 (30 Stat. L., chap 4, p. 101) says, "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel, which lies on the starboard side of such vessel." This repeats the language of the act of 1885, using the word "fairway" as a synonym for midchannel. The witness Macauley, for the libellee, says "the fairway for the port of Honolulu is from one mile off Diamond Head in the direction of the fairway buoy toward Honolulu," and that the inter-island vessels in coming to Honolulu from the windward islands would approach Diamond Head within one mile and pass to the south of the bell buoy or fairway buoy within about a quarter of a mile. This location, according to the Century Dictionary, and the implied meaning of the word as expressed in the statutes as being a channel, and not the open sea, is not a fairway at all. According to Webster's Dictionary definition,—"the part of a river, bay, etc., through which vessels enter or depart," the fairway would be the water around the entrance to the channel leading into Honolulu harbor, which would include the locality where libelant's boat was. It is evident from the testimony and from the judicial knowledge of the court that the region seaward of the bell buoy and westerly to shallow water toward Pearl Harbor is the region of approach to all vessels seeking the port of Honolulu and the line running from a mile off Diamond Head to a point a quarter of a mile south of the bell buoy would be approximately the course of vessels approaching the harbor from the windward islands under a trade wind.

The question of fact arises, whether the libelant's boat carried a riding light at the time of the collision. The three witnesses who were fishing near libelant testified that they saw the schooner approaching, saw libelant's light and noticed that it disappeared as the schooner passed, some of them supposing

that the vessel had passed between them and it and so obstructed the light, and when it did not reappear some of them supposed that the libelant had pulled up his anchor and started for port. Of the crew of the libellee, the lookout Kalua, who died before the trial, was the only one who appears to have seen the libelant's boat before the collision. James Ulunehele, the son of the captain, who was on deck standing in front of the wheel, says that he heard the lookout say "put the wheel hard down, I see a dark object in front, but I don't know what it was," and heard the captain ask "if there was a light on this dark object," and the lookout reply "no." Manewa says that he was on deck amidships near the cook-house, that he did not see the collision but heard it, and heard the lookout say "put the helm down" and the captain say "what is that?" and the lookout reply "there is some dark object before us," and upon the captain's asking if there was any light the lookout answered "no light." The captain says he was on deck near the wheel, heard the lookout say "put the helm a-port, hard down," that he asked if there was any light and the lookout answered "no"; also that the lookout spoke of a dark object. All the rest of the witnesses except one, testified that the lookout said there was a dark object ahead; the only one who did not hear that being Samuela who, being below when the collision took place, heard someone say "a boat, a boat, a boat."

So there is the testimony of these three witnesses that they heard the lookout say there was no light, against the testimony of the four witnesses on the other side, who said that the light was burning and they saw it. The unanimous testimony of all of the witnesses for the libellee, except one, who were on board the schooner, as to hearing the lookout say there was a dark object ahead has a somewhat suspicious quality in it, especially as they were far from unanimous in the rest of their evidence. James Ulunehele even goes so far as to say that his father asked if there was any light on the *dark object*. If this testimony is believed it is not definite as to what the lookout had in his mind in saying "there is a dark object ahead," yet it does

not seem likely that a man who was looking at a lighted boat would have said "there is a dark object ahead"; he would have said " I see a light ahead," or "a boat with a light." The evidence, if it is accepted, would tend to show that there was no light. These men all belong to the ship and naturally took an interest in the ship's side of the case. The Japanese witnesses on the other hand were independent fishermen, and it did not appear that they had any interest in the libelant or his fortunes except the remote one of being his countrymen. No other reason for their making out a case in his behalf exists. Of the three men who testified that they heard the lookout tell the captain that there was no light, one was the captain's son, one was the captain himself, who was deeply interested in the outcome of the case as affecting his own standing as a master mariner, and the other was one of the crew. To my mind the testimony supporting the theory that libelant's light was burning outweighs that against it.

There is evidence by one of the crew that the lookout, Kalua, was troubled with his eyesight; the witness Inuinu says that " something was the matter with his eyes," he did not know what it was but it was some sore or trouble, that he had heard him say so and that he suffered pain, though there was nothing that appeared wrong in his eyes to an observer. This is denied by the captain, who says that nothing was the matter with his eyes.

One important question of fact is the time between the alarm by the lookout and the collision. James Ulunehele makes it seven minutes, Kauhane two or three minutes, Perry less than a minute and timed by clapping his hands to represent the alarm and again to represent the collision, eight seconds; Manewa five or ten minutes; Inuinu has no idea; Ulunehele, the captain, two minutes after the conversation of the lookout and putting the wheel down. I will adopt, out of this confused testimony, the theory that it was two minutes, counsel for the libellee having adopted that period as his theory of the time. It is testified that the schooner was sailing three miles an hour, which would

mean 528 feet in two minutes. The boat was then in sight, the captain and crew had been warned and were on the alert, the helm was put down and the vessel collided either with the boat itself or with the boat's anchor line which was supported with a float about ten feet from the bow of the boat. The Concord was under foresail and two jibs at the time. No change was made in the position of her sails, the jib sheets were not let go and nothing was done to bring her into the wind except putting the helm hard down. With the mainsail down and the jibs and foresail drawing, it was naturally a difficult thing at that slow rate of speed, for her to come up into the wind. The obvious operation was to have put the helm hard up and gone to leeward of the fishing boat, the wind being on the quarter and the position of the sails being most favorable to such a maneuver. Such an operation would have probably cleared the boat in a distance of 528 feet.

The captain testified that the lookout reported the libelant's boat as two points on the lee bow. None of the other witnesses heard this statement. It was in the captain's interest to have such testimony go in, as if that were the case the luffing of the schooner would have been the correct maneuver if she was close to the boat. The correctness of this testimony is doubtful in my mind. In the first place it is not supported by the memory of any other witness; in the second place the schooner struck the boat or the anchor line within ten feet of it, which would have been most unlikely if the boat were in the position testified to with the schooner luffing.

There has been considerable testimony and discussion in this case as to how the schooner struck the boat, the defense endeavoring to show that the bow struck the anchor line of the boat, which was supported about ten feet from the bow of the boat by a float. The libelant, on the other hand, endeavors to show and argues that she must have struck the boat on her starboard side near the bow. Upon the theory of the defense it is difficult to see how the boat would receive the injuries which she did receive as evidenced by the testimony of the

carpenter who repaired her. This evidence shows that she was considerably shattered forward of the mast to an extent which required repairs costing twenty-five dollars and resulting, according to the testimony of the boat-builder, in a weakening of the boat so that her value after being repaired was diminished about one-half. It is not easy to see how such injuries could have resulted from the schooner's striking her anchor rope, the result of which would be that she would have swung against the side of the schooner, and although in that position she might have been capsized, yet it does not seem likely that any serious damage would have occurred to her hull, especially as the schooner was moving slowly and was then coming up into the wind with the helm hard down, which maneuver must have further diminished her speed. The weight of evidence I think supports the theory of a collision in which the schooner struck the boat with her cut-water between her mast and her bow.

How far was the schooner responsible and was there any contributory negligence on the part of the libelant? The contention of counsel for libellee that the maneuver of the schooner in going to windward instead of to leeward, if wrong, was an action *in extremis,* as she was "right on top" of the boat before it was seen by anyone on the schooner, is not supported by the evidence. Analysing the testimony of the libellee's witnesses I come to the conclusion that when the lookout discovered the boat she was several hundred feet away and that there was room to avoid her.

It is argued by libellee's counsel that the lookout could not tell whether the boat was moving or anchored and therefore could not be expected to judge of the proper maneuver to make. If the boat carried a riding light, that in itself would imply that she was at anchor; if there was no riding light there was still room to act intelligently. Everything was in favor of the schooner's falling off to leeward and that is the movement which should have been tried unless it was clear that the boat was in motion to leeward.

On the theory that the boat carried a light, the counsel for

the libellee claims that the boat was liable for whatever happened because the light was not a statutory light, and has quoted the law of the United States in regard to the requirements of vessels carrying lights. His reference as to vessels at anchor (act of February 8, 1895: 28 Stat., L., p. 647), simply requires that such vessels under 150 feet long at anchor shall carry at a height not more than twenty feet above the hull, a white light visible all around the horizon at a distance of at least one mile. This corresponds with the latest legislation on the subject which is the act to amend an act to adopt regulations for preventing collisions at sea, the amending act having been approved January 19, 1907. (35 Stat. L., part 1, p. 851). The section referring to this case is as follows: "g. Every fishing vessel and every fishing boat under 150 feet in length, when at anchor, shall exhibit a white light visible all around the horizon at a distance of at least one mile." Now, it is in evidence by a witness for the libellee that the light of a Japanese fishing boat, describing it, is visible for about three-quarters of a mile. This is all the evidence there is on this point and while this does not fulfil the requirement, yet, if under the circumstances there is no prejudice arising to anyone on account of such failure, or it did not contribute to the disaster, it is not a matter to prejudice the case of the one showing such a light.

Among other things, the libellee's counsel contends that the libelant's boat being anchored in the track of vessels approaching Honolulu harbor was anchored in a dangerous place and was obstructing navigation, and quotes authorities. I find, however, that the obstructions contemplated by the authorities are something more than the mere anchoring in the track of vessels but are rather piles, wrecks, and other obstructions on the bottoms and sides of channels, and things of that kind. A single boat anchored as this one was in an open roadstead where the vessels approaching a harbor at night are few and far between is not open to that charge nor is it a specially dangerous locality. Moreover, the Concord was not approaching the harbor, was not intending to enter the harbor at that time; it was

merely lying off and on waiting for daylight and it was much nearer in than there was any necessity for. The law referred to by counsel (30 Stat. L., p. 102), refers to sailing vessels or boats fishing with nets or lines or trawls. It does not appear to refer to boats at anchor, although it says that the rule does not give a boat engaged in fishing the right of obstructing a fairway used by vessels other than fishing boats. This statute is evidently considering the obstruction of waters used in navigation by the nets or lines or trawls of fishermen, which sometimes are very extensive and might seriously embarrass the movements of vessels using the same waters.

Counsel for libellee makes a strong contention for divided damages on the ground that libelant remained passive when approached by the schooner, when he might have changed his position and so avoided the collision. He might have done so, it is true, if he had known early enough what course the schooner would take. A moving vessel in a seaway yaws more or less, and it is not easy for one ahead of it to exactly decide what its course is. This difficulty is increased where one is in danger of being run down by the approaching vessel, and expecting her to change her course to avoid a collision but uncertain as to what that change shall be. *Engstrom v. The Peck,* 48 Fed. Rep. 334. The question is not an easy one to decide. The statutes referring to collisions provide much more fully for the conduct of vessels in motion approaching each other than they do in regard to a vessel in motion approaching a vessel at anchor, but the principles relating to the case of a steamship approaching a sailing vessel are somewhat similar to a case of a moving ship approaching a vessel at anchor, in that in the first case the sailing vessel is to keep on her course and it is for the steamship to keep out of the way, which is analagous to the second case in which the anchored vessel remains in her position and the moving vessel must keep away from her. It is the duty of the sailing vessel in the first case and of the anchored vessel in the second case, if they have opportunity to do so, to avoid a collision which is imminent by

departing from the rule of keeping on the course in the first place, and as to a vessel at anchor, by cutting adrift or paying out chain or doing anything else that can be done to avoid immediate collision; and the law which does not hold a sailing vessel endangered by a steamer liable for a mistaken move when the steamer has put her in a dangerous situation, applies equally to an anchored vessel which makes a mistaken move or mistakenly makes no move when put in jeopardy by an approaching vessel.

"Where a vessel, by her own negligence * * * places another in great peril, the latter will not be held guilty of negligence because at the last moment she did something that contributed to the collision, or omitted to do something that might have avoided it." *The E. A. Packer,* 49 Fed Rep. 92, 98-99; *The Schmidl v. The Reading,* 43 Id. 815; *The Havana,* 54 Id. 411, 416; *The Nichols,* 74 U. S. 656, 666; *The Carroll,* 75 Id. 302; *The City of Paris,* 76 Id. 634; *The Lucille,* 82 Id. 676; *The Favorita,* 85 Id. 598, 603; *The Falcon,* 86 Id. 75, 78; *The Sea Gull,* 90 Id. 165, 181; *S. S. Co. v. Rumball,* 62 Id. 372, 383.

The conspicuous fact of the case as admitted by the defense and found by the court is that, with or without a light, the libelant's boat was discovered when the libellee was over 500 feet away; she was moving, by her own testimony, not more than three miles an hour, and as found by the court she collided with libelant's boat. The presumptions are against her. The burden of proof is upon her to acquit herself of liability. She has shown no satisfactory excuse or justification for the collision.

The libelant has satisfactorily proved damage according to the following schedule:

| | |
|---|---|
| Articles, implements and gear, lost | $ 85.10 |
| Illness and sickness | 100.00 |
| Medical attendance | 3.50 |
| Permanent depreciation of boat | 60.00 |

Repairs to boat ........................... 25.00
Earnings lost ............................. 60.00

Total ........................... $333.60

A decree may be entered for $333.60 with interest from November 7, 1905, the date of filing the libel,—estimated at $43.93, and costs.